UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL B. HOLLAND et al.,

    *Plaintiffs*,

v.

BRENDA LOU MURRAY et al.,

    *Defendants*.

Civil Action No. 21-567 (TJK)

## MEMORANDUM OPINION AND ORDER

Plaintiffs are allegedly the trustees of the United Mine Workers of America 1974 Pension Trust, a pension plan that provides retirement benefits to tens of thousands of retired coal miners and their surviving spouses. Plaintiffs claim that Defendants owe the trust roughly $6.5 billion because of their relationships with a corporate entity that withdrew from the plan. Pending before the Court are Defendants' three motions to dismiss the complaint and Plaintiffs' motion to file a surreply to the briefing on those motions. As relevant to this Opinion and Order, Defendants argue that Plaintiffs' claims are nonjusticiable for lack of standing or for mootness. The Court disagrees, and so it will deny their motions insofar as they seek dismissal for lack of subject-matter jurisdiction, and it will deny as moot Plaintiff's motion to file a surreply.

**I. Background**

    **A.  Factual Background**

The plan is a multiemployer, employee-pension-benefit plan under the Employment Retirement Income Security Act of 1974 ("ERISA") and the Multiemployer Pension Plan Amendments Act ("MPPAA"). *See* ECF No. 5 ("Compl.") ¶ 15 (citing 28 U.S.C. § 1002(2), (37)).[1] The

---

[1] These facts are drawn from Plaintiffs' complaint, and the Court assumes them to be true.

United Mine Workers of America ("UMWA") and Bituminous Coal Operators' Association, Inc. established the plan. *Id.* ¶ 16. The plan provides a defined benefit, *id.*, which means that its beneficiaries receive "fixed" payments, *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1619–20 (2020). Its beneficiaries are tens of thousands of retired coal miners and their eligible surviving spouses. Compl. ¶ 16. Plaintiffs are the plan's trustees.[2] *Id.* ¶ 17.

Plaintiffs tie Defendants to the plan based on their alleged connections to Murray Holdings. *See* Compl. ¶ 6. Murray Holdings was a large, privately owned coal company that employed thousands of UMWA members. *Id.* ¶ 22. Until his recent death, Robert Murray was its president, its chief executive officer, and the chair of its board. *Id.* ¶¶ 19, 24. His estate is one of the defendants. *Id.* ¶ 18. His wife, Brenda Murray—another defendant—worked for Murray Holdings and Robert Murray. *Id.* ¶ 20. She also was appointed as the fiduciary of the estate. *Id.* ¶ 18. A third named defendant is Chagrin Executive Offices, LLC ("Chagrin"), a company Robert Murray created, owned, and controlled as its chief executive officer. *Id.* ¶ 21. The remaining defendants are unnamed legal entities owned or controlled by Robert and Brenda Murray. *See id.* ¶ 2.

Murray Energy Corporation was a wholly owned subsidiary of Murray Holdings. Compl. ¶ 24. Murray Energy Corporation was the "ultimate parent of most of the group's operating subsidiaries." *Id.* Plaintiffs define "Murray Energy Corporation and its operating subsidiaries" as "Murray Energy." *Id.* ¶ 25.

Murray Holdings and many of its affiliates recently filed for Chapter 11 bankruptcy. Compl. ¶ 22.[3] In those proceedings, Murray Energy withdrew from the plan after rejecting its

---

[2] Defendants dispute that Plaintiffs have adequately alleged they are plan trustees with capacity to sue on its behalf. *See* ECF No. 16-1 at 18–19. The Court does not resolve that dispute because doing so is unnecessary for purposes of this order.

[3] *See also In re Murray Energy Holdings Co.*, 19-BK-56885 (JEH) (Bankr. S.D. Ohio 2020).

collective-bargaining agreement with UMWA. *Id.* ¶¶ 61–62. Plaintiffs say that withdrawal triggered liability under ERISA and the MPPAA. *Id.* ¶ 29. UMWA sent Defendants letters assessing their withdrawal liability at over $6.5 billion and demanding a "lump sum" payment in that amount. *Id.* ¶ 70. Plaintiffs believe Defendants "do not intend to pay." *Id.* ¶ 71.

### B.     Procedural Background

Plaintiffs sued Defendants on the theory that ERISA imposes withdrawal "liability not only on the employer who is signatory to the collective-bargaining agreement requiring contributions, but upon its entire multi-entity corporate group, all trades and businesses which are members of the signatory employer's 'controlled group' under ERISA." Compl. ¶ 4; *see also id.* ¶¶ 37–41 (citing 29 U.S.C. § 1301(b)(1)). Plaintiffs claim that Defendants are part of a controlled group with Murray Energy, a group they call the "Murray Controlled Group." *Id.* ¶¶ 27, 29. They ask the Court to render judgment declaring that Defendants, as part of the Murray Controlled Group, are "a single employer" under ERISA and the MPPAA and so are jointly and severally liable for Murray Energy's withdrawal. *See id.* ¶¶ 72–80. Accordingly, they also seek to recover more than $6.5 billion. *Id.* ¶¶ 81–86.

Defendants have separately moved to dismiss on various jurisdictional and merits grounds. *See* ECF Nos. 16-1 (Brenda Murray), 19-1 (Chagrin), 38-1 (the estate). The estate's motion also incorporates the arguments raised in an earlier, now denied-as-moot motion to dismiss. *See generally* ECF No. 20; *see also* ECF No. 38-1 at 7; ECF No. 37. As relevant here, Defendants argue that the Court lacks subject-matter jurisdiction because the plan has no unremedied, concrete injury. *See* ECF No. 16-1 at 14–18; ECF No. 19-1 at 9–10; ECF No. 20-1 at 9. Alternatively, they say the Court lacks subject-matter jurisdiction because any injury is not fairly traceable to them, but is instead self-inflicted. *See* ECF No. 38-1 at 8–23; *see also* ECF No. 16-1 at 10–12.

3

In response, Plaintiffs filed a combined opposition to Defendants' motions to dismiss, *see* ECF No. 26, and an opposition to the estate's renewed motion to dismiss, ECF No. 39.[4] Defendants replied. See ECF Nos. 28, 39, 40; *see also* ECF No 31-1. Plaintiffs have also moved for leave to file a surreply opposing the estate's reply in support of its renewed motion to dismiss, ECF No 41. The estate opposes that motion. ECF No. 42.

## II.  Legal Standards

To the extent they challenge the Court's subject-matter jurisdiction, Defendants' motions rely on Federal Rule of Civil Procedure 12(b)(1). Under Rule 12(b)(1), Plaintiffs have "the burden of establishing jurisdiction by a preponderance of the evidence." *Moran v. U.S. Capitol Police Bd.*, 820 F. Supp. 2d 48, 53 (D.D.C. 2011). The Court must accept their allegations as true, *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993), and grant them "the benefit of all inferences that can be derived from the facts alleged," *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quotation omitted). But Plaintiffs' allegations will receive "closer scrutiny" than if the Court were resolving a motion to dismiss for failure to state a claim. *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001) (quotation omitted). And the Court "may consider materials outside the pleadings." *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

Motions contesting constitutional justiciability are properly brought under Rule 12(b)(1). *See Matthew A. Goldstein, PLLC v. U.S. Dep't of State*, 153 F. Supp. 3d 319, 330–31 & n.9 (D.D.C. 2016). Those include motions challenging standing, *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987), and motions claiming that a dispute is moot, *Indian River Cnty. v. Rogoff*, 254

---

[4] Like the estate, Plaintiffs incorporated their earlier opposition to the estate's original motion to dismiss. *See* ECF No. 39-1 at 9; ECF No. 26 (opposing the estate's first motion, ECF No. 20); *see also* ECF No. 37.

F. Supp. 3d 15, 18 (D.D.C. 2017). To demonstrate standing at the pleading stage, Plaintiffs' complaint must "state a plausible claim that [the plan] has [1] suffered an injury in fact [2] fairly traceable to the actions of [Defendants] that is [3] likely to be redressed by a favorable decision on the merits." *See Humane Soc'y v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015). To demonstrate that a dispute is not moot, Plaintiffs must show that they retain "a legally cognizable interest in the outcome." *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quotation omitted).

## III. Analysis

Defendants challenge the first two elements of standing: an injury-in-fact and traceability. On the former element, they say that Congress has separately promised to backstop the plan's obligations, making the plan indifferent between obtaining judicial relief and obtaining public funds. *See* ECF No. 16-1 at 12–18; ECF No. 19-1 at 9–10; ECF No. 38-1 at 8 n.2.[5] On the latter, they say the plan's injury—if it has one—was caused by the plan itself during bankruptcy proceedings. *See* ECF No. 38-1 at 18.

Defendants are wrong on both fronts. Any promise made by Congress is no substitute for the award Plaintiffs seek, and the Court must assume for this analysis that Plaintiffs are entitled to that award. *See Cutler v. HHS*, 797 F.3d 1173, 1179 (D.C. Cir. 2015). Moreover, nothing that happened during the bankruptcy proceedings can deprive Plaintiffs of standing here.

---

[5] For the same reason, they assert that this dispute is moot. *See* ECF No. 19-1 at 10. Although standing and mootness are similar doctrines, they are not identical. *See Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190–92 (2000). Because Defendants identify nothing that has changed since Plaintiffs filed their operative complaint, this issue was present at the "outset" of this litigation, making standing the correct lens through which to analyze the cognizability of relief. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021).

### A. Plaintiffs' Claimed Injury Is Not Otherwise Remedied

Defendants' first argument relies on the Bipartisan American Miners Act of 2019 ("BAMA"). Pub. L. No. 116-94 div. M, § 102, 133 Stat. 2534, 3091 (codified at 30 U.S.C. § 1232(*i*)). Congress has appropriated money to be paid annually into a combined fund—from which the plan draws—in an amount necessary to ensure that the fund can "provide benefits." *See* 30 U.S.C. § 1232(*i*)(1)(A). Although there are statutory caps on those appropriations, *see id.* § 1232(*i*)(3)(A), BAMA appropriates additional money to the plan to make up any potential shortfall, *see id.* § 1232(*i*)(4)(A). In other words, Congress has guaranteed that the plan will be able to "to pay benefits required." *Id.* But it has chosen to do so by annual appropriations needed to meet the plan's obligations due in a given "fiscal year." *See id.* § 1232(*i*)(1)(A).

Defendants seize on this statute to argue that the plan has no concrete interest in their alleged $6.5 billion withdrawal liability. Once "Congress stepped in and agreed to fully fund the Plan," they say, "the Plan ceased to be injured in a constitutional, Article III sense" because the plan will have sufficient funds to pay out all benefits regardless of the outcome of litigation. ECF No. 16-1 at 14–15.[6] They also rely on two recent Supreme Court decisions: *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), and *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615. Defendants misread both the statute and those decisions.

The relief Plaintiffs seek is not fungible with what BAMA provides. Plaintiffs ask for a "lump sum of $6,512,516,970.09." Compl. at 20. BAMA contemplates a series of annual

---

[6] Congress anticipated a version of this argument and tried to prevent it. BAMA states that the funds it provides "shall be disregarded . . . for purposes of determining [an] employer's withdrawal liability under [ERISA]." 30 U.S.C. § 1232(*i*)(4)(E). Plaintiffs argue that this part of the statute forecloses Defendants' standing theory. *See, e.g.*, ECF No. 26 at 12. The Court need not reach that argument, however, because, as it explains below, the plan is still allegedly injured even after considering the funds Congress appropriated via BAMA.

6

payments in an amount no more than necessary to satisfy the plan's obligations in a given year. *See* 30 U.S.C. § 1232(*i*).

The lump sum is superior for at least two reasons. First, it would be a proverbial bird in the hand. The reduced certainty of receiving a stream of future payments instead of a lump sum is an injury sufficient to support standing. *See Flight Attendants Against UAL Offset (FAAUO) v. Comm'r*, 165 F.3d 572, 574–75 (7th Cir. 1999). Second, money has time value. Thus, "delay in . . . Plaintiffs' receipt of [money] . . . is an actual, tangible pecuniary injury." *See In re OPM Data Sec. Breach Litig.*, 928 F.3d 42, 66 (D.C. Cir. 2019).

Accordingly, *TransUnion* supports Plaintiffs' standing. There, the Supreme Court explained that "[c]ourts must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation." *TransUnion*, 141 S. Ct. at 2204. Courts' only independent role is to ensure that the injury Congress has identified is constitutionally concrete. *See id.* at 2205–07. And the "most obvious" concrete injuries are "traditional tangible harms, such as . . . monetary harms." *Id.* at 2204. Plaintiffs have alleged that a statute entitles them to sue based on Defendants' obligation, and the obligation the statute allegedly imposes is to provide money timely. *See* Compl. ¶¶ 70, 86. Given that the Court is bound to assume Plaintiffs are right about that obligation, *see Cutler*, 797 F.3d at 1179, their alleged injury easily clears Article III's bar.[7]

*Thole* is not to the contrary. Although it, like this case, concerned a defined-benefit plan, the plaintiffs were *participants* in the plan—not representatives of the plan itself. *Thole*, 140 S. Ct. at 1620. Because the amount a beneficiary receives is "fixed and will not change, regardless of

---

[7]Thus, the case also is not moot, even if that were the right lens through which to consider Defendants' arguments. "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013).

7

how well or poorly the plan is managed," the Supreme Court held that those plaintiffs suffered no concrete harm from that plan's alleged mismanagement. *Id.* at 1619–20. That case says nothing about injuries to plans themselves.

Because the plan here has alleged a traditional concrete injury that is unremedied by BAMA, Plaintiffs have alleged an injury-in-fact.

### B. Defendants' Liability Caused Plaintiffs' Injury

Still, Defendants say Plaintiffs' injury is not fairly traceable to them. ECF No. 38-1 at 12–23. Collectively, they offer two reasons for that conclusion. First, they say that, in the underlying bankruptcy proceeding, "Plaintiffs intentionally caused the withdrawal liability so that Plaintiffs could pursue claims against the Estate." ECF No. 38-1 at 9. Second, they think similar actions by third parties are superseding causes of Plaintiffs' injuries. *See id.* at 18–23; ECF No. 16-1 at 17–18. Both theories are wrong.

"The causation standard for Article III standing is not particularly demanding." *Garnett v. Zeilinger*, 485 F. Supp. 3d 206, 218 (D.D.C. 2020). That standard "does not require that the defendant be the most immediate cause, or even a proximate cause, of the plaintiffs' injuries; it requires only that those injuries be 'fairly traceable' to the defendant." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017) (citation omitted). The Supreme Court has recently explained that traceability should be evaluated with respect to the "'allegedly unlawful conduct' of which the plaintiffs complain." *California v. Texas*, 141 S. Ct. 2104, 2114 (2021) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).

The relationship between the statutory liability and the plan's injury is straightforward here. ERISA and the MPPAA allegedly impose $6.5 billion in liability on Defendants and entitle Plaintiffs to that amount. Compl. ¶¶ 72–86. Thus, the statutory obligation and the alleged injury—

Defendants' failure to pay their alleged obligation—are not just "linked," *see Iyengar v. Barnhart*, 233 F. Supp. 2d 5, 11–12, they are coterminous. It is that simple.

In trying to shift attention to the underlying bankruptcy proceeding, Defendants make hash of ERISA and the MPPAA. Withdrawal liability attaches no matter whether an employer withdraws voluntarily or involuntarily. Congress passed the ERISA "to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984). But Congress learned that "ERISA did not adequately protect plans from the adverse consequences that resulted when individual employers terminate their participation in, or withdraw from, multiemployer plans." *Id.* at 722. There was thus a need "to provide a disincentive to voluntary employer withdrawals." *Id.* Congress responded by passing the MPPAA, which "requires that an employer withdrawing from a multiemployer pension plan pay a fixed and certain debt to the pension plan." *Id.* at 725. By imposing continuing liability after a withdrawal, the MPPAA helps prevent opportunistic employers from withdrawing from plans voluntarily—or otherwise—to avoid liability altogether.

Courts have thus explained that withdrawal liability attaches no matter the employer's reasons for withdrawal. As the Ninth Circuit observed, "many, if not most, employer withdrawals are involuntary to some degree, but no appellate court has found that factor relevant" to assessing withdrawal liability. *Bd. of Trs. of W. Conf. of Teamsters Pension Tr. Fund v. Thompson Bldg. Materials, Inc*, 749 F.2d 1396, 1407 (9th Cir. 1984); *see also, e.g.*, *DeIanni v. Progress Printing Corp.*, No. 17-cv-737 (KLM), 2018 WL 4680336, at *10 (D. Colo. Sept. 28, 2018) (It is " quite settled that withdrawal from a multiemployer pension plan need not be voluntary for withdrawal liability to apply.") (collecting cases); ECF No. 39 at 8–10. These decisions make clear that

9

employers—including employers in a control group—are still on the hook for withdrawal liability even if the reason for the withdrawal was beyond their control.

Thus, Plaintiffs have adequately alleged that their injury is traceable to Defendants. In the bankruptcy proceedings, an entity Plaintiffs call "Murray Energy" allegedly withdrew from the plan, "trigger[ing] withdrawal liability that the bankruptcy estate could not satisfy in full." Compl. ¶¶ 29, 62. Then Defendants were allegedly liable for the outstanding withdrawal liability as they were allegedly part of Murray Controlled Group. *Id.* ¶¶ 27, 34, 67, 70. Defendants, Plaintiffs allege, "do not intend to pay the withdrawal liability." *Id.* ¶ 71. In other words, Defendants are causing injury to the plan—and by extension Plaintiffs—by failing to pay their withdrawal liability. Traceability can be no clearer.

Defendants' invocation of the self-inflicted injury doctrine is misplaced.[8] True, it is "well-settled in this jurisdiction that self-inflicted injuries—injuries that are substantially caused by the plaintiff's own conduct—sever the causal nexus needed to establish standing." *Ellis v. Comm'r*, 67 F. Supp. 3d 325, 336 (D.D.C. 2014), *aff'd,* 622 F. App'x 2 (D.C. Cir. 2015). But even if Defendants were right that Plaintiffs caused Murray Energy's withdrawal from the plan, that fact is irrelevant. Plaintiffs' injury is Defendants' alleged *failure to pay* the withdrawal liability, not the withdrawal itself or the liability that flowed from it. Plaintiffs cannot have caused that.

---

[8] Specifically, the estate argues that, in the bankruptcy proceedings, "Murray Energy" and UMWA unsuccessfully negotiated over proposed changes to their collective-bargaining agreement. ECF No. 39 at 20; ECF No. 38-1 at 15–16. UMWA rejected those changes "without good cause" under applicable bankruptcy law. ECF No. 38-2 ¶ 64–66 (discussing 29 U.S.C. § 1113(c)(2)). The bankruptcy court then granted a motion by the bankrupt entities to reject that proposal, ECF No. 38-1 at 15–16, 18; ECF No. 38-2 at 7–8. As a result, "Murray Energy" allegedly withdrew from the plan. ECF No. 5 ¶ 29. The estate argues now that Plaintiffs themselves or UMWA independently caused the foregoing events. ECF No. 38-1 at 18–23.

Anyway, Defendants' theory is factually unpersuasive. They mistakenly presuppose that "Murray Energy" might have continued contributing to the plan but for the withdrawal. *See* ECF No. 38-1 at 8. But at the time of the bankruptcy, "Murray Energy" was insolvent. Compl. ¶ 60. And the proposed modifications to the collective-bargaining agreement were, Murray Energy represented to the bankruptcy court, "expressly conditioned upon the elimination or modification of liabilities" Murray Energy owed the plan. ECF No. 39 at 21, 23 (quoting ECF No. 38-2 at 33); *see also* ECF No. 38-2 ¶ 65. So, withdrawal or not, the plan could not reasonably have expected to receive any payments from Murray Energy. *See* ECF No. 39 at 21. Moreover, Plaintiffs' role in the withdrawal appears minimal.[9] Their "limited objection," ECF No. 38-1 at 17, before the bankruptcy court was explicitly "limited to contesting and asking the Court not to consider the Debtors' efforts to have this court issue *dictum* on superfluous, collateral issues" about BAMA. ECF No. 38-3 at 4. That objection could not have "substantially" caused Murray Energy's eventual withdrawal, let alone its failure to pay withdrawal liability. *See Ellis*, 67 F. Supp. 3d at 336.

At bottom, Defendants have not identified a single ERISA case in which a court concluded that a plaintiff lacked standing to seek withdrawal liability because of events in an underlying bankruptcy proceeding. And their theory cannot be squared with the basic principles of traceability. Thus, the Court concludes that Plaintiffs' injury is fairly traceable to Defendants' "allegedly unlawful conduct of which the plaintiffs complain." *California v. Texas*, 141 S. Ct. at 2114

---

[9] Much of what Defendants identify as evidence that Plaintiffs caused the withdrawal liability depends on the conduct of UMWA, not Plaintiffs. Plaintiffs, who are charged with protecting the plan's participants and funds, 29 U.S.C. § 1104(a), are not responsible for UMWA's conduct in negotiating the collective-bargaining agreement underlying the bankruptcy proceedings. And because Plaintiffs' alleged injury is that *Defendants* have failed to pay their statutorily imposed withdrawal liability, Compl. ¶ 71, UMWA's conduct in bankruptcy proceedings is even less relevant than Plaintiffs'.

(quotation omitted).[10]  Because Plaintiffs have alleged an injury-in-fact, traceability, and redressability, they have established standing at the pleading stage.

## IV.     Conclusion and Order

For all the above reasons, it is hereby **ORDERED** that Defendants' motions to dismiss, ECF Nos. 16, 19, 38, to the extent they challenge the Court's subject-matter jurisdiction, are **DENIED**.  It is further **ORDERED** that Plaintiffs' Motion for Leave to File a Surreply, ECF No. 41, is **DENIED AS MOOT**.

**SO ORDERED.**

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: March 27, 2023

---

[10] Because the Court finds that Plaintiffs' injury is traceable to Defendants' allegedly unlawful conduct based on the parties' briefing, the Court need not consider the surreply Plaintiffs have moved for leave to file, which relates to this element.  ECF No. 41.  Thus, the Court will deny that motion as moot.